# EXHIBIT A

FILED
02-27-2017
John Barrett
Clerk of Circuit Court
2017CV001862
Honorable Clare L.
Fiorenza-03
Branch 03

STATE OF WISCONSIN          CIRCUIT COURT          MILWAUKEE COUNTY

JIMMY D. DAVIS, JR.
4803 W. Burleigh St.
Milwaukee, WI 53210,

and

JD DAVIS FUNERAL HOME, LLC
4803 W. Burleigh St.
Milwaukee, WI 53210,          Case No. _____
                             Case Code:   30106

              Plaintiffs,

v.

MEGHAN A. DWYER
6240 N. Navajo Ave.
Chicago, IL 60646-4123,

and

TRIBUNE MEDIA COMPANY
435 North Michigan Ave., 6th floor
Chicago, IL 60611,

              Defendants.

---

## SUMMONS

---

**THE STATE OF WISCONSIN, TO THE ABOVE-NAMED DEFENDANT:**

YOU ARE HEREBY NOTIFIED that Plaintiffs, Jimmy D. Davis, Jr. and JD Davis Funeral Home, LLC, have filed a lawsuit against you.   The complaint, which is attached, states the nature and basis of the legal action.

Within forty-five (45) days of receiving this summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes to the complaint.   The Court may reject or disregard an answer that does not follow the requirements of the statutes.   The

answer must be sent or delivered to the Court, whose address is **Clerk of Courts, Milwaukee County Courthouse, 901 N. Ninth Street, Milwaukee, WI 53233**, and to the attorney for Plaintiffs, **Anne M. Plichta, Wagner Law Group, S.C., 839 North Jefferson Street, Suite 400, Milwaukee, Wisconsin 53202.** You may have an attorney help or represent you.

If you do not provide a proper answer within forty-five (45) days, the Court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 27th day of February, 2017.

WAGNER LAW GROUP, S.C.
Attorneys for Plaintiffs

s/Anne M. Plichta
Anne M. Plichta (SBN 1046849)
839 N. Jefferson Street, Suite 400
Milwaukee, Wisconsin 53202
Tel:    414.278.7000
Fax:    414.278.7590
amp@wagner-lawgroup.com

FILED
02-27-2017
John Barrett
Clerk of Circuit Court
2017CV001662
Honorable Clare L.
Fiorenza-03
Branch 03

STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

---

JIMMY D. DAVIS, JR.
4803 W. Burleigh St.
Milwaukee, WI 53210,

and

JD DAVIS FUNERAL HOME, LLC
4803 W. Burleigh St.
Milwaukee, WI 53210,      Case No. _____
     Case Code: 30106

         Plaintiffs,

v.

MEGHAN A. DWYER
6240 N. Navajo Ave.
Chicago, IL 60646-4123,

and

TRIBUNE MEDIA COMPANY
435 North Michigan Ave., 6th floor
Chicago, IL 60611,

         Defendants.

---

## COMPLAINT

---

Plaintiffs Jimmy D. Davis, Jr. and JD Davis Funeral Home, LLC, by and through their attorneys, and for their complaint against Defendants Meghan A. Dwyer and Tribune Media Company, hereby state the following:

### NATURE OF THE CASE

1.      This action arises out of false and defamatory statements made by defendant Meghan A. Dwyer ("Dwyer") and broadcast and/or published by her employer, defendant Tribune Media Company ("Tribune Co.") regarding Jimmy D. Davis, Jr. ("Davis") and the JD Davis Funeral Home ("JD Davis").

2. The subject statements were included in various broadcast and online versions of a Milwaukee-area Fox-affiliate Fox 6 News "investigation" (the "Story") which purported to address the Wisconsin Department of Safety and Professional Services' ("DSPS") lack of oversight of Wisconsin funeral homes "all over the state." All published versions of the Story were written by Dwyer and entitled: "'It's too late to fix it:' State often buries funeral home complaints instead of investigating misconduct."

3. The author page promoting Dwyer posted on Fox 6 News' website proclaims that "[h]er stories have resulted in huge financial settlements for sources," among other representations.

4. Dwyer contacted Davis in early October of 2016, and told him she was preparing the Story for broadcast on November 10, 2016.

5. November is a ratings "sweeps" period for Milwaukee-area television stations. During a sweeps period, the Nielsen Corporation tracks data from participating households on what is watched on each television set and by whom. This data is used to determine how much stations charge local advertisers to air their advertisements for the following three months, based on the number of ratings "points" that station receives during a sweeps period.

6. The sweeps rating system gives news directors and broadcasters a financial incentive to promote and air the stories most likely to grab the attention of audiences during a sweeps period.

7. The Story was initially broadcast live on Fox 6 News' prime-time nine p.m. program on Thursday, November 10, 2016, following days of clips being broadcast on Fox 6 to promote the Story's debut. Both video of the November 10 live broadcast (the "Broadcast") and a text version of the Story (the "Article") were simultaneously made available on Fox6Now.com, Fox 6 News' website, and on Fox 6 News' Facebook page, which is "liked" by over 300,000

2

people and "followed" by over 282,000 people. More than 600 Fox6Now.com readers/viewers re-posted the Story (both Broadcast and Article) on their own Facebook pages.

8. Of the multiple defamatory statements of and concerning Plaintiffs included in the Story, the most damaging was the false statement that Plaintiffs billed a mother of a young son killed by multiple gunshot wounds $11,695.00, or "nearly $12,000" for basic funeral services – approximately ten times the amount she was actually billed – just days after her son's murder in August 2016.

9. In fact, the woman paid only $1,220.00, well below the prevailing market rate for such services. No one other than Defendants has ever claimed otherwise; and that amount is clearly reflected in numerous documents obtained by Dwyer in her "investigation" - including those provided by the payor of the $1,220.00 (hereinafter "Interview Subject A" or "Subject A"). Thus, the evidence in Defendants' possession prior to the Story's broadcast and publication clearly showed that Defendants' statements were untrue.

10. Subject A, who was dissatisfied with the facility capacity limit and the appearance of her son's body at his viewing eight days after his death, filed a complaint against JD Davis with DSPS in September 2016. Subject A was also a prominent interview subject of the Story.

11. The false statement in the Story that Plaintiffs billed Subject A "nearly $12,000" was highly defamatory as it represented a shocking and unconscionable excess over the value of goods and services she actually received. While Defendants are certainly liable for even such negligent conduct in defaming Plaintiffs, this statement was not the simple result of "mis-reading handwriting" or "human error," as Defendants have claimed.

12. The defamatory "nearly $12,000" statement was the calculated result of a reporter manufacturing a false "fact" regarding Plaintiffs - and literally, putting a spotlight on it– to create

fake support for Subject A's contentions that "JD Davis is a very bad man who don't no (sic) what he is doing, and all he is looking for is money" and "I want Fox 6 to help me help stop them from taking advantage of people."

13. Billing a grieving mother of a murdered son nearly $12,000 for funeral services available for one-tenth of that amount as she reels from the shock of her son's sudden and violent death certainly would reflect the character of a person and business who are just looking for money and taking advantage of people. If it had been true, Defendants' portrayal of Plaintiffs as a person and business who grossly overcharge vulnerable customers, and who no one should knowingly choose to do business with, might have served a public good.

14. But the "nearly $12,000" figure was blatantly false – indeed, fabricated - and served instead to irreparably harm a legitimate business and its owner (while simultaneously profiting the author and publishers of the falsehood).

15. Defendants' intentional direction of their malicious conduct in defaming Plaintiffs is particularly grievous as it appears to be racially and geographically targeted.

16. Davis is one of a proportionately very small number of African-Americans who own and operate funeral homes anywhere in Wisconsin. It is beyond any rational explanation that while citing an appalling set of wrongs consumers complained to DSPS were committed by "dozens" of funeral homes throughout the state during the past five years – such as burying the wrong body, losing remains, re-using caskets, and cremating bodies without permission –the Story nevertheless leaves these so-accused funeral homes (and their owners) anonymous.

17. In contrast, the Story names only two funeral home owners as recipients of any of the reported 150 consumer complaints made to DSPS in the past five years: Davis and J.C. Frazier ("Frazier"), owner of Northwest Funeral Chapel. Inc. ("Northwest"). Both are African-American,

4

both own funeral homes within a small subsection of Milwaukee (approximately 2.6 miles from each other), and neither has been in business as long as the nearby (non-minority, second-generation owned) competitor funeral home featured prominently (and positively) in the Story.[1]

18. The only consumer interview subjects included in the Broadcast, collectively referred to by Dwyer as "those people," were customers of JD Davis or Northwest.

19. Defendants' targeting of JD Davis for a story ostensibly about DSPS failure to investigate or discipline funeral homes based on consumer complaints appears even more irrational in light of the fact that JD Davis has, to date, received only a single consumer complaint filed with DSPS during all its years of operation – the (still-pending) complaint filed by Subject A only a few days after her son's funeral and just weeks before her videotaped interview with Dwyer.

20. Undeterred by factual truths, and having intentionally and falsely represented a document to be a bill for $11,695.00 when it was clearly not, Dwyer wove additional false and defamatory statements regarding Plaintiffs throughout the Story, including the statement that: "Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do."

21. These statements are patently false, and easily shown to be false by even a cursory review of the very documents Dwyer appears to have relied on in making them.

22. As anyone, including Defendants, would have expected, Defendants' comprehensive and widespread publication of false and defamatory statements concerning Plaintiffs in a wide variety of media outlets had immediate and devastating effects on Plaintiffs.

---

[1] According to Wisconsin Department of Financial Institutions records, that home (located within a dozen miles of the two African-American owned funeral homes named in the Story) was incorporated in 1960. In addition to a lengthy statement by its owner in both the Broadcast and Article, the online Article contains a link to a five minute and forty-three second video providing "Tips" from the owner on "How to Choose a Funeral Home."

23. Defendants were first notified, in writing, of Plaintiffs' awareness of false and defamatory content in the Story, and the immediate harm it was causing Plaintiffs, the day after it was broadcast/published. Plaintiffs have continued to notify Defendants on an ongoing basis as their damages rapidly accrue.

24. Within hours of the Broadcast, funeral customers began revoking their business from JD Davis, specifically citing Fox 6's false report that Plaintiffs charged Subject A $12,000 for her son's funeral. Two major clients of Davis' transportation company cancelled high-value contracts, citing the Fox 6 report. A corporate funeral trust account placement firm pulled its current and future business with JD Davis, citing the report of overbilling.

25. An individual customer who had placed a $22,000 burial trust with JD Davis removed it, citing the $12,000 figure; and prospective customers have questioned Davis as to whether a quoted price "is going to turn into $12,000." Davis has also learned that competitors have been referring prospective customers to the Story to deter them from doing business with Plaintiffs and secure business for themselves. Davis has also received reports of family members intervening to stop other family members from using JD Davis because of what Fox said they charged. In short, Plaintiffs' business was decimated within a week of the Story's broadcast/publication of false and defamatory statements of and concerning Plaintiffs.

26. While admitting that at least some of the defamatory statements of and concerning Plaintiffs in the Story are false, Defendants have refused to take any public, proactive steps to ameliorate the harms caused to Plaintiffs by Defendants' defamation.

27. To date, video replay of the Broadcast and the online Article are still available and promoted on the Fox6Now.com website and on Fox 6 News' Facebook page, with only latent

corrections made to just some of the false and defamatory content originally broadcast and published.

28.     Davis brings this action to vindicate his rights under civil law, to restore his reputation as the owner of an ethically and compassionately run business and a positive contributor to the community, and to establish Defendants' liability for the irreparable harm that they caused to his business interests and reputation by broadcasting and publishing false and defamatory statements of and concerning Plaintiffs.

29.     Plaintiffs seek an award of actual damages as well compensatory damages for the reputational harm caused by Defendants' defamatory statements. Given the willful, malicious, and targeted nature of Defendants' conduct, and Defendants' intentional disregard of Plaintiffs' rights, Plaintiffs also seek an award of punitive damages.

## PARTIES

30.     Plaintiff Jimmy D. Davis, Jr. ("Davis") is an adult resident of the State of Wisconsin residing at 4803 W. Burleigh St., Milwaukee, Wisconsin 53210.

31.     Davis is the sole owner of plaintiff JD Davis Funeral Home, LLC, ("JD Davis"), a domestic limited liability company incorporated in Wisconsin with its principal place of business located at 4803 W. Burleigh St., Milwaukee, WI 53210.

32.     Davis also owns JD Davis Transportation Company, LLC, a domestic limited liability company incorporated in Wisconsin with its principal place of business located at 4803 W. Burleigh St., Milwaukee, WI 53210.

33.     On information and belief, defendant Meghan A. Dwyer ("Dwyer") is an adult resident of the State of Illinois residing at 6240 North Navajo Ave., Chicago, IL 60646-4123.

34.     On information and belief, Dwyer is employed as an investigative reporter with Fox 6 WITI – Milwaukee ("Fox 6"), a Fox-affiliated television station located at 9001 North Green Bay Road, Milwaukee, Wisconsin 53209. Fox6Now.com is a website published and maintained by Fox 6.

35.     On information and belief, at all times material hereto, Fox 6 was fully owned by Tribune Broadcasting, a subsidiary of parent company and defendant Tribune Media Company. Tribune Media Company is a foreign corporation incorporated in the State of Delaware with its principal place of business located at 435 North Michigan Ave., Chicago, Illinois 60611.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over Defendants pursuant to Wis. Stat. § 801.05(1)(d), as they are engaged in substantial and not isolated activities within this state; and also pursuant to Wis. Stat. § 801.05(3), as Defendants caused defamatory statements regarding Plaintiffs, who are located in Wisconsin, to be broadcast and/or published in Wisconsin, causing injury to Plaintiffs.

37.     Venue is proper in this jurisdiction as the claims in issue arise from statements made in and broadcast or published from Milwaukee County; and Defendants do substantial business in Milwaukee County. See Wis. Stat. §§ 801.50(2)(a) and (c).

## FACTS

38.     JD Davis has been licensed to operate as a Funeral Establishment by the Wisconsin Department of Safety and Professional Services ("DSPS") since June 4, 2012.

39.     Davis has owned and operated JD Davis since it opened. Davis is not a licensed Funeral Director and consequently does not prepare bodies for viewing, in accordance with state law and regulations.

40.     In early October of 2016, Davis was contacted by Dwyer, who identified herself to him as a Fox 6 News reporter and also as an attorney licensed to practice in the State of Illinois.

Dwyer claimed to be doing a story on alleged lack of oversight of Wisconsin funeral homes by DSPS.

41. Dwyer claimed that she had been contacted by, and subsequently interviewed, three relatives of deceased persons who had been cared for at JD Davis in July and August of 2016 and complained to Dwyer. Dwyer identified the decedents by name, but not her interview subjects. (In addition to the previously identified "Subject A," Dwyer's other interview subjects are hereinafter referred to as "Subject B" and "Subject C.")

42. Davis told Dwyer that he was aware of only a single consumer complaint filed with DSPS against JD Davis, that of Subject A. Davis confirmed that overpayments had been made to JD Davis by Subject B and Subject C families due to account payments coming from multiple sources, and that he was working on returning those overpayments as they were identified.

43. On or about October 26, 2016, Dwyer contacted Davis a second time. Davis told Dwyer that he did not want to be personally interviewed for the story, but referred Dwyer to his counsel for comment on the record.

44. On October 28, 2016, Davis' counsel contacted Dwyer on Davis' behalf. Counsel confirmed that Davis had still received only a single consumer complaint from DSPS since JD Davis opened in 2012 – that of Subject A.

45. Dwyer admitted that any overpayments claimed by the Subject B and Subject C families had been confirmed as returned by those families as of October 17, 2016.

46. Dwyer also stated the Subject B and Subject C families told her they "plan to file" complaints with DSPS, and repeated this statement in the Article posted 13 days later. In the Broadcast, however, Dwyer stated that all families interviewed for the Story said they "had filed" complaints with DSPS.

47.     The November 10 Article still claims "Davis told Fox6 he was 'working on getting everyone their money back.'" In the November 10 Broadcast, Dwyer claims Davis told her: "he is working on getting everyone in our story their money back."

48.     Davis has never owed Subject A any money back, and never stated this to Dwyer or FOX6. Davis had no knowledge of who would or would not be included in the Story.

49.     Any reference to "money back" was made solely in reference to overpayments, which Dwyer confirmed were resolved as of October 17, 2016. By quoting Davis as either "working on getting everyone their money back" or "working on getting everyone in our story their money back," on November 10, 2016, without disclosing that whichever statement alleged had been made approximately six weeks earlier, and/or that all claims of overpayment had been amicably resolved three weeks earlier, Dwyer falsely depicted Davis as someone who owed customers money back but had not returned it.

50.     In fact, Davis never owed Subject A any money back at all and never claimed he did. The overpayments due to the Subject B and Subject C families, as Dwyer well knew, were returned several weeks prior to broadcast/publication of the Story.

51.     To the present date, Plaintiffs have not been notified of any complaints filed with DSPS against JD Davis from any consumers other than Subject A.

## When No Instances of Overcharging by Plaintiffs Materialized, Defendants Created a Fake One

52.     The introductory portion of the lengthy (over eight minutes) Broadcast set a reference point for the cost of a funeral in the relevant market by showing video of a Northwest customer saying: "It was as if because we didn't spend $8,000, $9,000, or $10,000 on a funeral, we got treated like crap." This quote was also the third sentence of the Article.

53.     The Broadcast went on to show video of Subject A saying: "We made a big mistake - but it was too late" regarding Plaintiffs. Dwyer then spoke while a photograph of Subject A's son was displayed, stating: "[Subject A]'s eighteen year old son [name omitted] was murdered this summer." The cause of his death, multiple gunshot wounds, was not identified anywhere in the Story.

54.     Next, the Broadcast displayed a full screen shot of a small portion of a document with a bright, superimposed spotlight centering on the only number visible on the screen: a handwritten $1,695.00. No other numbers or any other portion of the document, let alone the full document, are ever displayed in the Broadcast other than as a blurred zoom to reach the ultimately spotlit number.

55.     While the zoomed-in, spotlit image is held in still display on the screen, Dwyer states: "The bill for his funeral was nearly twelve thousand dollars ($12,000)," almost ten times the amount the bill for the funeral actually was. A screenshot of the spotlit image is attached hereto as **Exhibit A.**

56.     It is evident from even a cursory glance at the full document (attached hereto as **Exhibit B**, with Subject A's personal identification information redacted) that it is not a bill for any amount remotely near to $12,000. It is in fact an itemized invoice, signed by both Davis and Subject A, for funeral goods and services purchased on August 25, 2016. The central "Summary" portion of the bill clearly shows "Total Funeral Service Charges" of $1,695.00, with Cash Advance of $118.00 added for a complete total of $1,813.00, creating a written "Balance Due" of $1,313.00.

57.     While the briefest review of the invoice makes clear that Dwyer's statement that Plaintiffs billed House "nearly $12,000" was completely and intentionally false, it also makes clear

11

just how far Defendants went to fabricate the appearance of factual support for their false statement that Plaintiffs billed Subject A "nearly $12,000."

58. The "$1,695.00" spotlit in the Broadcast appears to have been taken from a subtotal of subsection (A) of the invoice and zoomed in on to reflect what is seemingly a stray mark next to the "1" in "$1,695.00."

59. Defendants' obvious intention in showing this image as Dwyer simultaneously (and falsely) stated the "nearly $12,000" figure was to mislead the viewer into believing the written $1,695.00 actually read "$11,695.00."

60. There was no purpose in including the (false) amount billed in the Story other than to depict Plaintiffs as taking advantage of their customers through "predatory" billing practices alleged by Dwyer.

61. The false statement: "The bill for his funeral was nearly $12,000" defamed Plaintiffs because it falsely depicts Davis as a business owner who takes advantage of customers by billing a grossly excessive amount, nearly ten (10) times more than the more-than-reasonable amount actually charged, for basic funeral services; and falsely depicts JD Davis as a funeral home which takes advantage of customers by billing a grossly excessive amount, nearly ten (10) times more than the more-than-reasonable amount actually charged, for basic funeral services.

62. In truth, Subject A paid Plaintiffs a below-market total of $1,220.00 for her son's modest funeral arrangements, as reflected in the receipt provided to Dwyer by DSPS during her "investigation."

63. The next images in the Broadcast appear to be personal videos of grieving persons attending the viewing of Subject A's son at JD Davis. No person viewing these images, or

12

attending the event personally, would have or could have seen any arrangements which could possibly have justified a bill of "nearly $12,000."

**Davis is Falsely Depicted as Breaking the Law by Preparing a Body for Viewing when He is not a Licensed Funeral Director, and Blaming the Family for the Result.**

64.    According to the Story, Subject A complained her son's body at visitation was "swollen, as if it had been inflated." Subject A was quoted as saying: "Shouldn't nobody child be seen like that," and "[i]t was so unprofessional."

65.    Plaintiffs' counsel provided a written statement on behalf of Davis to Fox 6 News pre-broadcast and publication of the Story in reliance on Dwyer's promise that any such statement would be posted in its entirety on Fox6Now.com. A copy of the statement (with names identifying Subjects A, B, and C redacted) is attached hereto as **Exhibit C.**

66.    The statement read in relevant part as to Subject A and her son (hereinafter "Decedent A"):

> Mr. ▆▆▆▆ died in the early morning hours of Monday, August 22, 2016 of multiple gunshot wounds to his arm, chest and back. Mr. ▆▆▆▆' family contacted JD Davis Funeral Home on Thursday, August 25, 2016 and the Home picked up his body for funeral preparation on the morning of Friday, August 26, 2016. Due to the major trauma to Mr. ▆▆▆▆' body and the extended time between his death and the family contacting the Home, the decomposition process had already begun by the time JD Davis Funeral Home received his body. Once this process has begun, a funeral director has limited ability to restore a body to a presentable state.
>
> JD Davis and its highly experienced funeral director (who has been licensed for over twenty years), did their best to prepare Mr. ▆▆▆▆' body for viewing, using all available techniques and the highest quality preparation materials. Both Mr. ▆▆▆▆' mother and aunt had the opportunity to view his body prior to services, and opted to leave his casket open. Mr. Davis and his staff grieve with Mr. ▆▆▆▆' mother, ▆▆▆▆ ▆▆▆▆, in her expression of not being able to recognize her own son in his casket nine days after his violent, senseless death.

67.    The Article stated:

Anne Plictha (sic), a lawyer representing Davis, sent Fox 6 News this letter after we asked her about his criminal record and the most recent complaints against his funeral home. Davis blames one of the families for not contacting the funeral home sooner

after death, saying the decomposition process had already begun by the time the body was received and there was little he could do.

68.  The underlined "this letter" in the posted Article purportedly led readers to a link containing counsel's letter; however, this link led to nothing other than an error message stating "this site cannot be reached" for the first fourteen hours it was posted. After Plaintiffs' counsel complained, the link was finally made functional. All other links contained in the Article appeared to be functional and led to the described materials at time of posting.

69.  Dwyer's statement that "Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do," is false because 1) Davis did not blame the family of Decedent A for the appearance of his body; and 2) Davis did not state there was "little he could do" about the appearance of Decedent A's body.

70.  In fact, Davis 1) attributed Decedent A's appearance to the major traumas to his body and the body's natural decomposition process over time; and 2) stated that once the decomposition process has begun, a funeral director (which Davis is not) has limited ability to restore a body to a presentable state. Davis responded further that: "JD Davis and its highly experienced funeral director (who has been licensed for over twenty years), did their best to prepare Mr. ███████' body for viewing, using all available techniques and the highest quality preparation materials."

71.  Dwyer's statements are defamatory because they falsely depict Davis as blaming a family (also his customer), rather than the circumstances surrounding Decedent A's death (including the trauma from his gunshot wounds, which the Article does not identify as the cause of his death), for his appearance; and as saying there was "little he could do" after decomposition had begun, when he did not, in fact, say this.

14

72.     By law, Davis personally could do nothing to prepare Decedent A's body. He is not a licensed funeral director. Davis' response in fact describes JD Davis' highly experienced funeral director as doing her best to prepare Decedent A's body for viewing, using all available techniques and the highest quality preparation materials.

73.     Davis stated the funeral director was "limited" by virtue of the condition of Decedent A's body; not that "there was little he could do."

74.     Dwyer's statements are also defamatory because they give the false impression that Davis personally prepared Decedent A's body, when he did not do so and was prohibited from doing so by law.

75.     Anyone reading the Article within the first fourteen hours of its publication would have no way of knowing that it was not Davis, but a licensed funeral director, who prepared Decedent A's body, or what Davis' statement actually said, in contrast to Dwyer's false representation of what his statement said.

## COUNT I

### DEFAMATION FOR STATEMENTS IN THE NOVEMBER 10, 2016 BROADCAST

76.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

77.     The Broadcast by Defendants contained false and defamatory statements of or concerning Plaintiffs.

78.     To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant Tribune Co. in making them.

79.     These statements were not privileged.

80.     The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

81.     By such Broadcast, Defendants did cause harm to Plaintiffs' reputations.

82.     Defendants' broadcast of these false statements was negligent at a minimum.

83.     In addition, and in the alternative, Defendants broadcast the statements with knowledge that they were false and/or with reckless disregard as to their truth.

84.     Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

85.     As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT II

### DEFAMATION FOR STATEMENTS PUBLISHED ON FOX6NOW.COM

86.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

87.     The online Article published by Defendants contained false and defamatory statements of or concerning Plaintiffs.

88.     To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant Tribune Co. in making them.

89.     These statements were not privileged.

90.     The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

91.     By publication of such Article, Defendants did cause harm to Plaintiffs' reputations.

92.     Defendants' publication of these false statements was negligent at a minimum.

93.     In addition, and in the alternative, Defendants published the statements with knowledge that they were false and/or with reckless disregard as to their truth.

94.     Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

95.     As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT III

### DEFAMATION FOR STATEMENTS PUBLISHED ON FACEBOOK

96.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

97.     The Broadcast and Article posted by Defendants on the Fox 6 News Facebook page contained false and defamatory statements of or concerning Plaintiffs.

98.     To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant Tribune Co. in making them.

99.     These statements were not privileged.

100.     The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

101.     By such posting on Facebook, Defendants did cause harm to Plaintiffs' reputations.

102.     Defendants' posting of these false statements was negligent at a minimum.

103.     In addition, and in the alternative, Defendants posted the statements with knowledge that they were false and/or with reckless disregard as to their truth.

104.     Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

105.     As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

**NOW WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1.     Actual, compensatory and assumed damages in an amount to be determined at trial;

2.     All costs, disbursements, and actual attorney's fees;

3.     Punitive damages in an amount to be later determined; and

4.     For such and other further relief as the court deems just and proper.

Dated this 27th day of February, 2017.

**WAGNER LAW GROUP, S.C.**
Attorneys for Plaintiffs

s/Anne M. Plichta
K. Scott Wagner (SBN 1004668)
Anne M. Plichta (SBN 1046849)

POST OFFICE ADDRESS
839 North Jefferson Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 278-7000
Facsimile: (414) 278-7590
Email: ksw@wagner-lawgroup.com
         amp@wagner-lawgroup.com

(US/Canada - one-way)

TOTAL OF (A)

FOR MERCHANDISE SELECTED $

N/A

N/A

N/A

N/A

N/A

FOX 6 NEWS
9:18  56°

EXHIBIT A

EXHIBIT B

## JD DAVIS FUNERAL HOME

*Thirty Funeral Homes*
*Nation's Trusted Dignity Care*

**5325 W. Greenfield Ave., Milwaukee. WI   (414) 944-8300**

Deceased: _____   Date _5/25/16_

### STATEMENT OF FUNERAL GOODS AND SERVICES SELECTED

*Charges are only for those items that you selected or that we required. If we are required by law or by a cemetery or crematory to use any items, we will explain the reasons in writing below.*

**A. CHARGE FOR SERVICES SELECTED**

1. **Professional Services:**

| | |
|---|---|
| Basic Services of Director | ✗ |
| Embalming | N/A |
| Pacemaker Removal (for cremation) | N/A |
| Dressing | N/A |
| Counseling | N/A |
| Casketing | N/A |
| Other Preparation | N/A |

2. **Facilities, Equipment & Staff:**

| | |
|---|---|
| Visitation (per hour) 12 – 2 | _____ |
| Funeral Service | N/A |
| Memorial Gathering | N/A |
| Memorial Service | N/A |
| Additional Staff | N/A |

3. **Transportation:**

| | |
|---|---|
| Transfer of Remains | ✗ |
| Hearse | N/A |
| Lead Car | N/A |
| Service Utility Vehicle | N/A |
| Limousine | N/A |
| Flower Car | N/A |
| Passenger Car | N/A |
| Residential Transfer | N/A |
| Additional Mileage ($3.00/mile one-way) | N/A |

TOTAL OF (A)  $ _1,095.00_

**B. CHARGE FOR MERCHANDISE SELECTED**

Casket (other payments)
_CREMATION (Reg Tra)_  _TEC_

Other Burial Container  N/A

| | |
|---|---|
| Acknowledgement Cards | N/A |
| Register Book | N/A |
| Prayer Cards | N/A |
| Cross / Crucifix | N/A |
| Cremation Urn | N/A |
| Clothing / Burial Garments | N/A |
| Cemetery Equipment | N/A |
| Temporary Grave Marker | N/A |

TOTAL OF (B)  $ _____

### C. PACKAGES

| | |
|---|---|
| Direct Cremation | N/A |
| Immediate Burial | N/A |
| Traditional Funeral | N/A |
| Forwarding Remains | N/A |
| Receiving Remains | N/A |

TOTAL OF (C)  $ _____

### D. CASH ADVANCES

_DEATH_   $3.00
_FLOWER_   $5.00  N/A
_____   N/A
_____   N/A
_____   N/A

TOTAL OF (D)  $ _115.00_

We charge you for our services in obtaining: (Specify cash advance items.)

**Summary**

| | |
|---|---|
| Total Funeral Service Charges (A+B+C) | $ _1,095.00_ |
| Total Cash Advances (D) | _115.00_ |
| **Complete Total** | $ _1,032.00_ |
| **Balance Due** | _____ |

### DISCLOSURES

If you selected a funeral that may require embalming, such as a funeral with viewing, you may have to pay for embalming. You do not have to pay for embalming that you did not approve if you selected arrangements such as direct cremation or immediate burial.   If we charge for embalming, we will explain why below.

Reason for embalming:  _Family Selected Embalming_

If any law, cemetery or crematory requirement have required the purchase of any additional items listed, the law or requirement is explained below.

### ACKNOWLEDGEMENT AND AGREEMENT

I(we) authorize this funeral establishment to perform services, furnish goods, and incur outside charges specified on this Statement. I(we) acknowledge that I(we) received a General Price List, a Casket Price List and an Outer Burial Container Price List.

Full payment is due at the time of services rendered. If payment is not paid when due, an unembalmed LATE CHARGE of ____ % per month (ANNUAL PERCENTAGE RATE) ____ % on the unpaid balance will be due. There is a $25.00 service fee for all returned checks. I(we) have read (or been read) the above, accept and approve and promise to make full payment. Receipt of a copy of this Statement is acknowledged.

Signed: _____

Social Security No. _____

Address _____

City, State, Zip _Milwaukee, WI  53208_

Telephone _____

Co-Signer: _____

ACCEPTANCE:  This funeral establishment agrees to provide all services, merchandise and cash advances indicated on this Statement.

By: _____





## WAGNER LAW
### ——— GROUP, S.C. ———
*Anne Morgan Plichta*
amp@wagner-lawgroup.com

839 North Jefferson Street
Suite 400 Milwaukee, WI 53202
t 414-278-7000
f 414-278-7590
www.wagner-lawgroup.com

3252

November 3, 2016



*Via Email*

Ms. Meghan Dwyer
Fox 6 News
MeghanDwyer@fox6news.com

      Re:    Request to Jimmy D. Davis, Jr. for comment on complaint from ▇▇▇▇▇▇▇▇,
            mother of homicide victim ▇▇▇▇▇▇▇, regarding JD Davis Funeral Home

Dear Ms. Dwyer:

      I represent Jimmy D. Davis, Jr., owner of JD Davis Funeral Home. Mr. Davis has owned and operated JD Davis Funeral Home in the Sherman Park neighborhood of Milwaukee since 2012, and worked in the funeral industry since 1998.

      Mr. Davis has served as a tireless advocate against gun violence and the devastating effects it has had in Milwaukee and many other communities across our country. As a first-hand observer of the destruction such violence causes, Mr. Davis has volunteered both his services and those of JD Davis Funeral Home to families deeply affected by gun violence but without resources to pay for funeral arrangements for their loved ones. (See http://fox6now.com/2016/04/28/three-children-ages-one-two-and-seven-left-behind-after-young-mother-shot-and-killed-by-son/, Posted 4:59 PM, April 28, 2016 by Justin Williams, Updated at 5:07 PM, April 28, 2016).

      While working with religious leaders and law enforcement to raise awareness of homicide in the community, Mr. Davis has publicly commented: "It hurts my heart. It hurts my mind to see day in and day out young people killing each other." (See http://www.wisn.com/article/staff-at-cemeteries-funeral-homes-overwhelmed-by-homicides/6327606, by Christina Palladino, Updated 10:30 PM CDT, July 10, 2015).

      ▇▇▇▇▇▇ was one such young person killed. Mr. ▇▇▇ died in the early morning hours of Monday, August 22, 2016 of multiple gunshot wounds to his arm, chest and back. Mr. ▇▇▇ family contacted JD Davis Funeral Home on Thursday, August 25, 2016, and the Home picked up his body for funeral preparation on the morning of Friday, August 26, 2016. Due to the major trauma to Mr. ▇▇▇ body and the extended time between his death and the family contacting the Home, the decomposition process had already begun by the time JD Davis Funeral

Home received his body. Once this process has begun, a funeral director has limited ability to restore a body to a presentable state.

JD Davis Funeral Home and its highly experienced funeral director (who has been licensed for over twenty years), did their best to prepare Mr. ███████ body for viewing, using all available techniques and the highest quality preparation materials. Both Mr. ██████' mother and aunt had the opportunity to view his body prior to services, and opted to leave his casket open. Mr. Davis and his staff grieve with Mr. ██████' mother, █████████, in her expression of not being able to recognize her own son in his casket nine days after his violent, senseless death.

JD Davis Funeral Home treats all loved ones entrusted to its care and their families with the utmost skill, respect and dignity. While providing the highest quality service possible, neither JD Davis or any other provider of funeral services can eliminate the pain and distress of seeing a deceased loved one who does not, and never again will, physically appear as they remember. Not wishing to cause the ██████ family any additional distress over finances, Mr. Davis refunded a significant portion of the funeral costs to Mr ██████ family without request.

Throughout its years in business, the only complaint JD Davis Funeral Home has ever been made aware of by the Wisconsin Department of Safety and Professional Services is Ms. ██████ complaint regarding her son's funeral preparations. In a letter dated September 20, 2016, the Department requested information from the Home's funeral director to determine whether the complaint should be opened for investigation. That information was promptly provided on September 29, 2016. No further communication has been received from the Department by Mr. Davis, and he is not aware of any other complaints made to the Wisconsin Department of Safety and Professional Services regarding him or his business.

Ms. Dwyer, in your October 28, 2016 conversation with me, you stated that in September of this year you interviewed family members of two decedents (apparently with the last names of ██████ and ██████ who claimed they plan to file complaints with the Wisconsin Department of Safety and Professional Services regarding Mr. Davis and/or JD Davis Funeral Home's body preparation and/or "financial shenanigans." To date, no such complaints have actually been made that we are aware of. As such, Mr. Davis respectfully declines to respond to your speculative claims of possible future complaints.

For the sake of clarification, JD Davis Funeral Homes did provide funeral preparation services for Mr. ██████████ and Mr. ██████████ during the month of September 2016. Mr. ██████ died of massive injuries from a motorcycle accident. Before his body was received by JD Davis Funeral Home, his organs and bones were removed for donation by a "full harvest" procedure. A "full harvest" leaves few remains for a funeral director to prepare for burial, and in Mr. ██████'s case, even these remains had been damaged in his accident. While everything that could be done to improve the appearance of Mr. ██████'s remains was done by JD Davis Funeral Home, it is certainly understandable that family members would still be shocked or distressed upon viewing Mr. ██████'s remains. The deepest sympathies of Mr. Davis and the entire staff of JD Davis Funeral Home are with the family of Mr. ██████, as they are with all the grieving families they service.

Regarding the matter of Mr. ███████, who died a natural death, it appears that overpayment was initially made on his account due to payments coming from multiple sources. Once the overpayment was identified, it was promptly corrected. Mr. Davis is not aware of any unresolved financial concerns raised by families the JD Davis Funeral Home has served.

While your vague innuendoes regarding anonymous "planned" complaints related to Mr. Davis and/or the JD Davis Funeral Home remain both vague and innuendo, the homicide epidemic we are experiencing in Milwaukee is all too real. Few in our community can speak to this better than funeral home owners and directors, particularly those such as Mr. Davis who serve areas greatly impacted by gun violence.

We encourage your news organization to present stories reflecting both the sources of gun violence in Milwaukee and those individuals and organizations working to stop it. A funeral professional, serving in the most competent and caring manner, will never be able to erase the trauma and pain experienced by those so bereaved. Awareness and attention can help cease the violence causing such grief.

Please feel free to contact me if you have any further questions regarding this matter.

Sincerely,

*M. Plichta*

Anne M. Plichta

AMP:lse