IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JIMMY D. DAVIS, JR. and
JD DAVIS FUNERAL HOME, LLC,

    Plaintiffs,

v.    Case No. 17-cv-561-LA

MEGHAN A. DWYER and
WITI TELEVISION LLC,

    Defendants.

## AMENDED COMPLAINT

Plaintiffs Jimmy D. Davis, Jr. and JD Davis Funeral Home, LLC, by and through their attorneys, and for their complaint against Defendants Meghan A. Dwyer and WITI Television, LLC, hereby state the following:

### NATURE OF THE CASE

1. This action arises out of false and defamatory statements made by defendant Meghan A. Dwyer ("Dwyer") and broadcast and/or published by her employer, defendant WITI Television, LLC ("WITI") regarding Jimmy D. Davis, Jr. ("Davis") and the JD Davis Funeral Home ("JD Davis").

2. The subject statements were included in various broadcast and online versions of a Milwaukee-area Fox-affiliate Fox 6 News "investigation" (the "Story") which purported to address the Wisconsin Department of Safety and Professional Services' ("DSPS") lack of oversight of Wisconsin funeral homes "all over the state." All published versions of the Story were written by



Dwyer and entitled: "'It's too late to fix it:' State often buries funeral home complaints instead of investigating misconduct."

3. The author page promoting Dwyer posted on Fox 6 News' website proclaims that "[h]er stories have resulted in huge financial settlements for sources," among other representations.

4. Dwyer contacted Davis in early October of 2016, and told him she was preparing the Story for broadcast on November 10, 2016.

5. November is a ratings "sweeps" period for Milwaukee-area television stations. During a sweeps period, the Nielsen Corporation tracks data from participating households on what is watched on each television set and by whom. This data is used to determine how much stations charge local advertisers to air their advertisements for the following three months, based on the number of ratings "points" that station receives during a sweeps period.

6. The sweeps rating system gives news directors and broadcasters a financial incentive to promote and air the stories most likely to grab the attention of audiences during a sweeps period.

7. The Story was initially broadcast live on Fox 6 News' prime-time nine p.m. program on Thursday, November 10, 2016, following days of clips being broadcast on Fox 6 to promote the Story's debut. Both video of the November 10 live broadcast (the "Broadcast") and a text version of the Story (the "Article") were simultaneously made available on Fox6Now.com, Fox 6 News' website, and on Fox 6 News' Facebook page, which is "liked" by over 300,000 people and "followed" by over 282,000 people. More than 600 Fox6Now.com readers/viewers re-posted the Story (both Broadcast and Article) on their own Facebook pages.

8. Of the multiple defamatory statements of and concerning Plaintiffs included in the Story, the most damaging was the false statement that Plaintiffs billed a mother of a young son

2

killed by multiple gunshot wounds $11,695.00, or "nearly $12,000" for basic funeral services – approximately ten times the amount she was actually billed – just days after her son's murder in August 2016.

9. In fact, the woman paid only $1,220.00, well below the prevailing market rate for such services. No one other than Defendants has ever claimed otherwise; and that amount is clearly reflected in numerous documents obtained by Dwyer in her "investigation" - including those provided by the payor of the $1,220.00 (hereinafter "Interview Subject A" or "Subject A"). Thus, the evidence in Defendants' possession prior to the Story's broadcast and publication clearly showed that Defendants' statements were untrue.

10. Subject A, who was dissatisfied with the facility capacity limit and the appearance of her son's body at his viewing eight days after his death, filed a complaint against JD Davis with DSPS in September 2016. Subject A was also a prominent interview subject of the Story.

11. The false statement in the Story that Plaintiffs billed Subject A "nearly $12,000" was highly defamatory as it represented a shocking and unconscionable excess over the value of goods and services she actually received. While Defendants are certainly liable for even such negligent conduct in defaming Plaintiffs, this statement was not the simple result of "mis-reading handwriting" or "human error," as Defendants have claimed.

12. The defamatory "nearly $12,000" statement was the calculated result of a reporter manufacturing a false "fact" regarding Plaintiffs - and literally, putting a spotlight on it– to create fake support for Subject A's contentions that "JD Davis is a very bad man who don't no (sic) what he is doing, and all he is looking for is money" and "I want Fox 6 to help me help stop them from taking advantage of people."

13. Billing a grieving mother of a murdered son nearly $12,000 for funeral services available for one-tenth of that amount as she reels from the shock of her son's sudden and violent death certainly would reflect the character of a person and business who are just looking for money and taking advantage of people. If it had been true, Defendants' portrayal of Plaintiffs as a person and business who grossly overcharge vulnerable customers, and who no one should knowingly choose to do business with, might have served a public good.

14. But the "nearly $12,000" figure was blatantly false – indeed, fabricated - and served instead to irreparably harm a legitimate business and its owner (while simultaneously profiting the author and publishers of the falsehood).

15. Defendants' intentional direction of their malicious conduct in defaming Plaintiffs is particularly grievous as it appears to be racially and geographically targeted.

16. Davis is one of a proportionately very small number of African-Americans who own and operate funeral homes anywhere in Wisconsin. It is beyond any rational explanation that while citing an appalling set of wrongs consumers complained to DSPS were committed by "dozens" of funeral homes throughout the state during the past five years – such as burying the wrong body, losing remains, re-using caskets, and cremating bodies without permission –the Story nevertheless leaves these so-accused funeral homes (and their owners) anonymous.

17. In contrast, the Story names only two funeral home owners as recipients of any of the reported 150 consumer complaints made to DSPS in the past five years: Davis and J.C. Frazier ("Frazier"), owner of Northwest Funeral Chapel. Inc. ("Northwest"). Both are African-American, both own funeral homes within a small subsection of Milwaukee (approximately 2.6 miles from

each other), and neither has been in business as long as the nearby (non-minority, second-generation owned) competitor funeral home featured prominently (and positively) in the Story.[1]

18. The only consumer interview subjects included in the Broadcast, collectively referred to by Dwyer as "those people," were customers of JD Davis or Northwest.

19. Defendants' targeting of JD Davis for a story ostensibly about DSPS failure to investigate or discipline funeral homes based on consumer complaints appears even more irrational in light of the fact that JD Davis has, to date, received only a single consumer complaint filed with DSPS during all its years of operation – the (still-pending) complaint filed by Subject A only a few days after her son's funeral and just weeks before her videotaped interview with Dwyer.

20. Undeterred by factual truths, and having intentionally and falsely represented a document to be a bill for $11,695.00 when it was clearly not, Dwyer wove additional false and defamatory statements regarding Plaintiffs throughout the Story, including the statement that: "Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do."

21. These statements are patently false, and easily shown to be false by even a cursory review of the very documents Dwyer appears to have relied on in making them.

22. As anyone, including Defendants, would have expected, Defendants' comprehensive and widespread publication of false and defamatory statements concerning Plaintiffs in a wide variety of media outlets had immediate and devastating effects on Plaintiffs.

---

[1] According to Wisconsin Department of Financial Institutions records, that home (located within a dozen miles of the two African-American owned funeral homes named in the Story) was incorporated in 1960. In addition to a lengthy statement by its owner in both the Broadcast and Article, the online Article contains a link to a five minute and forty-three second video providing "Tips" from the owner on "How to Choose a Funeral Home."

5

23. Defendants were first notified, in writing, of Plaintiffs' awareness of false and defamatory content in the Story, and the immediate harm it was causing Plaintiffs, the day after it was broadcast/published. Plaintiffs have continued to notify Defendants on an ongoing basis as their damages rapidly accrue.

24. Within hours of the Broadcast, funeral customers began revoking their business from JD Davis, specifically citing Fox 6's false report that Plaintiffs charged Subject A $12,000 for her son's funeral. Two major clients of Davis' transportation company cancelled high-value contracts, citing the Fox 6 report. A corporate funeral trust account placement firm pulled its current and future business with JD Davis, citing the report of overbilling.

25. An individual customer who had placed a $22,000 burial trust with JD Davis removed it, citing the $12,000 figure; and prospective customers have questioned Davis as to whether a quoted price "is going to turn into $12,000." Davis has also learned that competitors have been referring prospective customers to the Story to deter them from doing business with Plaintiffs and secure business for themselves. Davis has also received reports of family members intervening to stop other family members from using JD Davis because of what Fox said they charged. In short, Plaintiffs' business was decimated within a week of the Story's broadcast/publication of false and defamatory statements of and concerning Plaintiffs.

26. While admitting that at least some of the defamatory statements of and concerning Plaintiffs in the Story are false, Defendants have refused to take any public, proactive steps to ameliorate the harms caused to Plaintiffs by Defendants' defamation.

27. To date, video replay of the Broadcast and the online Article are still available and promoted on the Fox6Now.com website and on Fox 6 News' Facebook page, with only latent

corrections made to just some of the false and defamatory content originally broadcast and published.

28. Davis brings this action to vindicate his rights under civil law, to restore his reputation as the owner of an ethically and compassionately run business and a positive contributor to the community, and to establish Defendants' liability for the irreparable harm that they caused to his business interests and reputation by broadcasting and publishing false and defamatory statements of and concerning Plaintiffs.

29. Plaintiffs seek an award of actual damages as well compensatory damages for the reputational harm caused by Defendants' defamatory statements. Given the willful, malicious, and targeted nature of Defendants' conduct, and Defendants' intentional disregard of Plaintiffs' rights, Plaintiffs also seek an award of punitive damages.

## **PARTIES**

30. Plaintiff Jimmy D. Davis, Jr. ("Davis") is an adult resident of the State of Wisconsin residing at 4803 W. Burleigh St., Milwaukee, Wisconsin 53210.

31. Davis is the sole owner of plaintiff JD Davis Funeral Home, LLC, ("JD Davis"), a domestic limited liability company incorporated in Wisconsin with its principal place of business located at 4803 W. Burleigh St., Milwaukee, WI 53210.

32. Davis also owns JD Davis Transportation Company, LLC, a domestic limited liability company incorporated in Wisconsin with its principal place of business located at 4803 W. Burleigh St., Milwaukee, WI 53210.

33. On information and belief, defendant Meghan A. Dwyer ("Dwyer") is an adult resident of the State of Illinois.

7

34. On information and belief, at all times material hereto, Dwyer was employed as an investigative reporter with Fox 6 WITI – Milwaukee ("Fox 6"), a Fox-affiliated television station with its principal office located at 9001 North Green Bay Road, Milwaukee, Wisconsin 53209. Fox6Now.com is a website published and maintained by Fox 6.

35. On information and belief, at all times material hereto, Fox 6 was an assumed business name used by WITI Television, LLC, which is a foreign limited liability company organized under Delaware law and a wholly owned subsidiary of Tribune Media Company. Tribune Media Company is a foreign corporation incorporated in the State of Delaware with its principal place of business located at 435 North Michigan Ave., Chicago, Illinois 60611. As such, defendant WITI Television, LLC is a citizen of Delaware and Illinois for diversity jurisdiction purposes.

**JURISDICTION AND VENUE**

36. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000.

37. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and under 28 U.S.C. § 1441(a), because this Court is the United States District Court for the district embracing the place where this action was pending prior to removal.

**FACTS**

38. JD Davis has been licensed to operate as a Funeral Establishment by the Wisconsin Department of Safety and Professional Services ("DSPS") since June 4, 2012.

39. Davis has owned and operated JD Davis since it opened. Davis is not a licensed Funeral Director and consequently does not prepare bodies for viewing, in accordance with state law and regulations.

40. In early October of 2016, Davis was contacted by Dwyer, who identified herself to him as a Fox 6 News reporter and also as an attorney licensed to practice in the State of Illinois. Dwyer claimed to be doing a story on alleged lack of oversight of Wisconsin funeral homes by DSPS.

41. Dwyer claimed that she had been contacted by, and subsequently interviewed, three relatives of deceased persons who had been cared for at JD Davis in July and August of 2016 and complained to Dwyer. Dwyer identified the decedents by name, but not her interview subjects. (In addition to the previously identified "Subject A," Dwyer's other interview subjects are hereinafter referred to as "Subject B" and "Subject C.")

42. Davis told Dwyer that he was aware of only a single consumer complaint filed with DSPS against JD Davis, that of Subject A. Davis confirmed that overpayments had been made to JD Davis by Subject B and Subject C families due to account payments coming from multiple sources, and that he was working on returning those overpayments as they were identified.

43. On or about October 26, 2016, Dwyer contacted Davis a second time. Davis told Dwyer that he did not want to be personally interviewed for the story, but referred Dwyer to his counsel for comment on the record.

44. On October 28, 2016, Davis' counsel contacted Dwyer on Davis' behalf. Counsel confirmed that Davis had still received only a single consumer complaint from DSPS since JD Davis opened in 2012 – that of Subject A.

45. Dwyer admitted that any overpayments claimed by the Subject B and Subject C families had been confirmed as returned by those families as of October 17, 2016.

46. Dwyer also stated the Subject B and Subject C families told her they "plan to file" complaints with DSPS, and repeated this statement in the Article posted 13 days later. In the Broadcast, however, Dwyer stated that all families interviewed for the Story said they "had filed" complaints with DSPS.

47. The November 10 Article still claims "Davis told Fox6 he was 'working on getting everyone their money back.'" In the November 10 Broadcast, Dwyer claims Davis told her: "he is working on getting everyone in our story their money back."

48. Davis has never owed Subject A any money back, and never stated this to Dwyer or FOX6. Davis had no knowledge of who would or would not be included in the Story.

49. Any reference to "money back" was made solely in reference to overpayments, which Dwyer confirmed were resolved as of October 17, 2016. By quoting Davis as either "working on getting everyone their money back" or "working on getting everyone in our story their money back," on November 10, 2016, without disclosing that whichever statement alleged had been made approximately six weeks earlier, and/or that all claims of overpayment had been amicably resolved three weeks earlier, Dwyer falsely depicted Davis as someone who owed customers money back but had not returned it.

50. In fact, Davis never owed Subject A any money back at all and never claimed he did. The overpayments due to the Subject B and Subject C families, as Dwyer well knew, were returned several weeks prior to broadcast/publication of the Story.

51. To the present date, Plaintiffs have not been notified of any complaints filed with DSPS against JD Davis from any consumers other than Subject A.

### When No Instances of Overcharging by Plaintiffs Materialized, Defendants Created a Fake One

52. The introductory portion of the lengthy (over eight minutes) Broadcast set a reference point for the cost of a funeral in the relevant market by showing video of a Northwest customer saying: "It was as if because we didn't spend $8,000, $9,000, or $10,000 on a funeral, we got treated like crap." This quote was also the third sentence of the Article.

53. The Broadcast went on to show video of Subject A saying: "We made a big mistake - but it was too late" regarding Plaintiffs. Dwyer then spoke while a photograph of Subject A's son was displayed, stating: "[Subject A]'s eighteen year old son [name omitted] was murdered this summer." The cause of his death, multiple gunshot wounds, was not identified anywhere in the Story.

54. Next, the Broadcast displayed a full screen shot of a small portion of a document with a bright, superimposed spotlight centering on the only number visible on the screen: a handwritten $1,695.00. No other numbers or any other portion of the document, let alone the full document, are ever displayed in the Broadcast other than as a blurred zoom to reach the ultimately spotlit number.

55. While the zoomed-in, spotlit image is held in still display on the screen, Dwyer states: "The bill for his funeral was nearly twelve thousand dollars ($12,000)," almost ten times the amount the bill for the funeral actually was. A screenshot of the spotlit image is attached hereto as **Exhibit A.**

56. It is evident from even a cursory glance at the full document (attached hereto as **Exhibit B**, with Subject A's personal identification information redacted) that it is not a bill for any amount remotely near to $12,000. It is in fact an itemized invoice, signed by both Davis and Subject A, for funeral goods and services purchased on August 25, 2016. The central "Summary"

11

portion of the bill clearly shows "Total Funeral Service Charges" of $1,695.00, with Cash Advance of $118.00 added for a complete total of $1,813.00, creating a written "Balance Due" of $1,313.00.

57. While the briefest review of the invoice makes clear that Dwyer's statement that Plaintiffs billed House "nearly $12,000" was completely and intentionally false, it also makes clear just how far Defendants went to fabricate the appearance of factual support for their false statement that Plaintiffs billed Subject A "nearly $12,000."

58. The "$1,695.00" spotlit in the Broadcast appears to have been taken from a subtotal of subsection (A) of the invoice and zoomed in on to reflect what is seemingly a stray mark next to the "1" in "$1,695.00."

59. Defendants' obvious intention in showing this image as Dwyer simultaneously (and falsely) stated the "nearly $12,000" figure was to mislead the viewer into believing the written $1,695.00 actually read "$11,695.00."

60. There was no purpose in including the (false) amount billed in the Story other than to depict Plaintiffs as taking advantage of their customers through "predatory" billing practices alleged by Dwyer.

61. The false statement: "The bill for his funeral was nearly $12,000" defamed Plaintiffs because it falsely depicts Davis as a business owner who takes advantage of customers by billing a grossly excessive amount, nearly ten (10) times more than the more-than-reasonable amount actually charged, for basic funeral services; and falsely depicts JD Davis as a funeral home which takes advantage of customers by billing a grossly excessive amount, nearly ten (10) times more than the more-than-reasonable amount actually charged, for basic funeral services.

62. In truth, Subject A paid Plaintiffs a below-market total of $1,220.00 for her son's modest funeral arrangements, as reflected in the receipt provided to Dwyer by DSPS during her "investigation."

63. The next images in the Broadcast appear to be personal videos of grieving persons attending the viewing of Subject A's son at JD Davis. No person viewing these images, or attending the event personally, would have or could have seen any arrangements which could possibly have justified a bill of "nearly $12,000."

**Davis is Falsely Depicted as Breaking the Law by Preparing a Body for Viewing when He is not a Licensed Funeral Director, and Blaming the Family for the Result.**

64. According to the Story, Subject A complained her son's body at visitation was "swollen, as if it had been inflated." Subject A was quoted as saying: "Shouldn't nobody child be seen like that," and "[i]t was so unprofessional."

65. Plaintiffs' counsel provided a written statement on behalf of Davis to Fox 6 News pre-broadcast and publication of the Story in reliance on Dwyer's promise that any such statement would be posted in its entirety on Fox6Now.com. A copy of the statement (with names identifying Subjects A, B, and C redacted) is attached hereto as **Exhibit C**.

66. The statement read in relevant part as to Subject A and her son (hereinafter "Decedent A"):

> Mr. ▮▮▮ died in the early morning hours of Monday, August 22, 2016 of multiple gunshot wounds to his arm, chest and back. Mr. ▮▮▮' family contacted JD Davis Funeral Home on Thursday, August 25, 2016 and the Home picked up his body for funeral preparation on the morning of Friday, August 26, 2016. Due to the major trauma to Mr. ▮▮▮' body and the extended time between his death and the family contacting the Home, the decomposition process had already begun by the time JD Davis Funeral Home received his body. Once this process has begun, a funeral director has limited ability to restore a body to a presentable state.
>
> JD Davis and its highly experienced funeral director (who has been licensed for over twenty years), did their best to prepare Mr. ▮▮▮' body for viewing, using all

13

available techniques and the highest quality preparation materials. Both Mr. ███'
mother and aunt had the opportunity to view his body prior to services, and opted to
leave his casket open. Mr. Davis and his staff grieve with Mr. ███' mother, ███
███, in her expression of not being able to recognize her own son in his casket
nine days after his violent, senseless death.

67. The Article stated:

> Anne Plictha (sic), a lawyer representing Davis, sent Fox 6 News <u>this letter</u> after we asked her about his criminal record and the most recent complaints against his funeral home. Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do.

68. The underlined "<u>this letter</u>" in the posted Article purportedly led readers to a link containing counsel's letter; however, this link led to nothing other than an error message stating "this site cannot be reached" for the first fourteen hours it was posted. After Plaintiffs' counsel complained, the link was finally made functional. All other links contained in the Article appeared to be functional and led to the described materials at time of posting.

69. Dwyer's statement that "Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do," is false because 1) Davis did not blame the family of Decedent A for the appearance of his body; and 2) Davis did not state there was "little he could do" about the appearance of Decedent A's body.

70. In fact, Davis 1) attributed Decedent A's appearance to the major traumas to his body and the body's natural decomposition process over time; and 2) stated that once the decomposition process has begun, a funeral director (which Davis is not) has limited ability to restore a body to a presentable state. Davis responded further that: "JD Davis and its highly experienced funeral director (who has been licensed for over twenty years), did their best to prepare Mr. ███' body for viewing, using all available techniques and the highest quality preparation materials."

14

71. Dwyer's statements are defamatory because they falsely depict Davis as blaming a family (also his customer), rather than the circumstances surrounding Decedent A's death (including the trauma from his gunshot wounds, which the Article does not identify as the cause of his death), for his appearance; and as saying there was "little he could do" after decomposition had begun, when he did not, in fact, say this.

72. By law, Davis personally could do nothing to prepare Decedent A's body. He is not a licensed funeral director. Davis' response in fact describes JD Davis' highly experienced funeral director as doing her best to prepare Decedent A's body for viewing, using all available techniques and the highest quality preparation materials.

73. Davis stated the funeral director was "limited" by virtue of the condition of Decedent A's body; not that "there was little he could do."

74. Dwyer's statements are also defamatory because they give the false impression that Davis personally prepared Decedent A's body, when he did not do so and was prohibited from doing so by law.

75. Anyone reading the Article within the first fourteen hours of its publication would have no way of knowing that it was not Davis, but a licensed funeral director, who prepared Decedent A's body, or what Davis' statement actually said, in contrast to Dwyer's false representation of what his statement said.

## COUNT I

### DEFAMATION FOR STATEMENTS IN THE NOVEMBER 10, 2016 BROADCAST

76. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

77. The Broadcast by Defendants contained false and defamatory statements of or concerning Plaintiffs.

78. To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant WITI in making them.

79. These statements were not privileged.

80. The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

81. By such Broadcast, Defendants did cause harm to Plaintiffs' reputations.

82. Defendants' broadcast of these false statements was negligent at a minimum.

83. In addition, and in the alternative, Defendants broadcast the statements with knowledge that they were false and/or with reckless disregard as to their truth.

84. Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

85. As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT II

### DEFAMATION FOR STATEMENTS PUBLISHED ON FOX6NOW.COM

86. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

87. The online Article published by Defendants contained false and defamatory statements of or concerning Plaintiffs.

88. To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant WITI in making them.

89. These statements were not privileged.

90. The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

91. By publication of such Article, Defendants did cause harm to Plaintiffs' reputations.

92. Defendants' publication of these false statements was negligent at a minimum.

93. In addition, and in the alternative, Defendants published the statements with knowledge that they were false and/or with reckless disregard as to their truth.

94. Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

95. As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT III

## DEFAMATION FOR STATEMENTS PUBLISHED ON FACEBOOK

96. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

97. The Broadcast and Article posted by Defendants on the Fox 6 News Facebook page contained false and defamatory statements of or concerning Plaintiffs.

98. To the extent these statements were made by defendant Dwyer, she was acting within the scope of her employment with defendant WITI in making them.

99. These statements were not privileged.

100. The actual injury and the substantial danger of injury to Plaintiffs' reputation from such statements are readily apparent. Such statements would tend to so harm one's reputation so as to lower him in the estimation of the community and/or to deter third persons from associating or dealing with him or her.

101. By such posting on Facebook, Defendants did cause harm to Plaintiffs' reputations.

102. Defendants' posting of these false statements was negligent at a minimum.

103. In addition, and in the alternative, Defendants posted the statements with knowledge that they were false and/or with reckless disregard as to their truth.

104. Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Plaintiffs' rights. Accordingly, punitive damages are appropriate.

105. As a direct and proximate result of these false statements by Defendants, Plaintiffs have suffered damages, including, *inter alia*, loss of present and future business, injury to their reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

**NOW WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1. Actual, compensatory and assumed damages in an amount to be determined at trial;

2. All costs, disbursements, and actual attorney's fees;

3. Punitive damages in an amount to be later determined; and

4. For such and other further relief as the court deems just and proper.

Dated this 9th day of May, 2017.

        **KERKMAN WAGNER & DUNN**
        Attorneys for Plaintiffs

        s/Anne M. Plichta
        K. Scott Wagner (SBN 1004668)
        Anne M. Plichta (SBN 1046849)

POST OFFICE ADDRESS
839 North Jefferson Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 277-8200
Facsimile: (414) 277-0100
Email: swagner@kwdlaw.com
       aplichta@kwdlaw.com