# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JIMMY D. DAVIS, JR. and
JD DAVIS FUNERAL HOME, LLC,
      Plaintiffs,

  v.                                        Case No. 17-C-0561

MEGHAN A. DWYER and
WITI TELEVISION, LLC,
      Defendants.

---

## DECISION AND ORDER

      The plaintiffs, Jimmy D. Davis, Jr., and JD Davis Funeral Home, LLC, allege that WITI Television, LLC, and one of its journalists, Meghan A. Dwyer, published a news story containing defamatory statements about them. Before me now is the defendants' motion for judgment on the pleadings. *See* Fed. R. Civ. P 12(c).

### I. BACKGROUND

      The following facts are taken from the allegations of the amended complaint, (which I accept as true for purposes of this motion), the exhibits attached to the complaint, and the exhibits attached to the defendants' answer.[1]

      Davis is the owner of the JD Davis Funeral Home. The funeral home is located in Milwaukee's Sherman Park neighborhood, which is predominantly African American. Defendant WITI Television, LLC, operates a Milwaukee-area Fox affiliate, Fox6, which

---

[1] The exhibits attached to the answer are documents to which the complaint refers, are concededly authentic, and are central to the plaintiffs' claim. Thus, I may consider them without converting the defendants' motion into one for summary judgment. *See Hecker v. Deere*, 556 F.3d 575, 582 (7th Cir. 2009).

airs a news program known as Fox6 News at 9. Defendant Dwyer was, at the time of the events that gave rise to this suit, one of WITI's investigative reporters.

On November 10, 2016, Fox6 ran a story by Dwyer about funeral homes and the state's regulation of funeral homes. The story was broadcast on the Fox6 News at 9 program and published on the station's website and Facebook page. It was primarily a video broadcast, but the versions published on the Internet included a written article having nearly the same content as the video broadcast. Except where noted, my description of the story below is based on the video rather than the written article.

The story begins with Dwyer, in the studio, describing events that occurred at funeral homes in Wisconsin. She calls these events "the stuff that nightmares are made of"—things like finding the wrong body in the casket or bodies being cremated without permission. Dwyer states that these events are happening, yet "the state is doing very little to fix it." The story then turns to video of interviews with family members of decedents who claim to have experienced some of these nightmarish funeral practices. One of the family members is Paula House. After Dwyer explains that "dozens of funeral homes across the state have been accused of wrongdoing—with very few consequences," House is depicted sitting in an chair and saying, "We made a big mistake—but it was too late." Dwyer narrates:

> Paula House's 18-year-old son Claude Grimes was murdered this summer. The bill for the funeral was nearly $12,000. But House says the funeral home was sweltering, it smelled bad, and she didn't even recognize her own son.

As Dwyer mentions the $12,000 bill, the camera zooms in on an invoice for the funeral, casting a spotlight on a line depicting a handwritten charge that looks like $11,695.00 (the plaintiffs allege that the charge was actually $1,695.00):

2



As Dwyer mentions the heat and odor, a brief video of guests at the funeral is shown. As more funeral footage plays, Dwyer continues to narrate: "[House] says the body was leaking fluids and was swollen as if it had been inflated." Video is shown of House shaking her head and stating, "It was so unprofessional—so unprofessional." The story then turns to another family member, Doris Ingram. She states in her interview that, at the funeral of her son, DeAngelo Maxwell, "guests got sick because the smell of rotting flesh filled the air." She describes her son's body as looking like it was "drooling at the mouth."

After describing these complaints, the story addresses the state's regulation of funeral homes, suggesting that it is deficient. Dwyer explains that, in the last five years, 150 families have complained about the services they received at Wisconsin funeral homes. The complaints accuse funeral directors of being drunk, smoking marijuana, putting the wrong person in a casket, and dealing heroin. Dwyer adds that "financial complaints are also common—family members claim they were preyed upon." Dwyer states that her research shows that these cases are rarely investigated and that funeral homes almost never receive discipline. After describing more examples of the state's lax oversight, Dwyer states:

> In fact, you can do some pretty egregious things and still run a funeral home in Wisconsin. Jimmy Davis Jr. owns JD Davis Funeral Home—where DeAngelo Maxwell and Claude Grimes were cared for.

3

Video of House is shown and she says of Davis, "I want Fox6 to help me stop him from taking advantage of people." While apparently hidden-camera footage of Davis is shown, Dwyer explains: "In 2012, Davis was caring for a sick elderly woman at her home. He stole her credit card and was convicted of theft."[2] Dwyer continues, "But in Wisconsin, even criminals are allowed to operate funeral homes."

After more discussion of state oversight and excerpts from the family-member interviews, the story concludes with Dwyer in the studio. She explains that "all of the families we interviewed for this story say they have filed complaints with the state licensing board." She states that the owner of JD Davis Funeral Home declined to be interviewed but said in a statement that the Funeral Home "treats all clients with skill, respect, and dignity." She then immediately adds that "Mr. Dwyer told me, though, he is working on getting everyone in our story their money back." The written version of the story also contains these statements, but it includes additional comments attributed to Davis. The written version states that Fox6 received a letter from Davis's lawyer. It then states: "Davis blames one of the families for not contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do." Answer Ex. E at 9.

The plaintiffs allege that some of the statements made about them in this story are false and defamatory. First, they allege that although the story claims that the bill for Claude Grimes's funeral was "nearly $12,000," in fact the bill was only $1,220. Am.

---

[2] After the story was first published, Davis, through counsel, informed defendants that he had been convicted of theft, but not for stealing a credit card. The defendants later revised the story to say that Davis "took money out of [a woman's] bank account and was convicted of theft." The plaintiff does not allege that the earlier reference to stealing a credit card was itself a defamatory statement.

4

Compl. ¶ 9. Second, they allege that the story falsely reports that Davis told Dwyer that he was "working on getting everyone in our story their money back." The plaintiffs contend that Davis told Dwyer only that some families had made overpayments and that those overpayments had been returned. They also contend that Davis told Dwyer that he refunded a significant portion of the cost of Claude Grimes's funeral to his family without request. Finally, the plaintiffs allege that the written article's statement that Davis "blamed the family" for the condition of a body and stated that there was "little he could do" was false and defamatory.

The defendants have filed a motion for judgment on the pleadings. As to the first statement, they concede that the complaint adequately alleges that the statement about Davis's billing the family $12,000 was false. However, they contend that, as a matter of law, the statement was not defamatory. As for the remaining statements, the defendants contend that they were not false and that, even if they were, they were not defamatory.

## II. DISCUSSION

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is similar to a motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6). On either motion, the court must read the complaint in the light most favorable to the plaintiff, accepting all well-pleaded facts as true and drawing all reasonable inferences in the plaintiff's favor. *Archer v. Chisolm*, 870 F.3d 603, 612 (7th Cir. 2017). The complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim

5

has the requisite plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The parties agree that Wisconsin substantive law applies to this case.[3] Under Wisconsin law, there are three elements to a defamation claim: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the one defamed, and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534 (1997). Only the first and third elements are at issue in this case. Moreover, in their motion for judgment on the pleadings, the defendants do not claim any privilege. Thus, the questions presented are (1) whether the plaintiffs have adequately alleged that the statements are false and (2) whether the plaintiffs have adequately alleged that the statements either lowered the plaintiffs in the estimation of the community or deterred third persons from associating or dealing with them. The second question can be restated as asking whether the complaint adequately alleges that the defendants' statements are "capable of a defamatory meaning." Under Wisconsin law, this is a question of law that the court may resolve on a motion to dismiss, provided that the complaint sets forth the allegedly defamatory communication in its full context. *See*

---

[3] Subject-matter jurisdiction is based on diversity, 28 U.S.C. § 1332. This is proper because Davis, the sole member of JD Davis Funeral Home, LLC, is a citizen of Wisconsin; Dwyer is a citizen of Illinois; and WITI Television LLC's sole member is a corporation organized under Delaware law with its principal place of business in Illinois. Thus, the parties are completely diverse. Also, the amount in controversy exceeds $75,000.

*Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10 (1980); *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). If the statement is capable of both a defamatory meaning and a non-defamatory meaning, then the jury must decide whether the statement was defamatory. *Starobin*, 94 Wis. 2d at 10.

## A. Statement About the Funeral's Cost

The first allegedly defamatory statement involves the reported cost of the funeral:

> Paula House's 18-year-old son Claude Grimes was murdered this summer. The bill for the funeral was nearly $12,000. But House says the funeral home was sweltering, it smelled bad, and she didn't even recognize her own son.

The defendants concede that the complaint adequately alleges that the reported cost of the funeral, "nearly $12,000," was false. However, they contend that their statement was not capable of a defamatory meaning because it simply mentioned a price and did not expressly allege that the price was excessive. But the statement as a whole, especially when considered in the context of the entire story, strongly *implied* that the price was excessive. The price is immediately followed by a "but" and then House's criticisms. The statement as a whole could reasonably be construed as meaning that the plaintiffs charged an outrageous price and then rendered services that were extremely deficient. Indeed, what purpose could mentioning the price—and showing the invoice on camera in dramatic fashion—have served other than to give the impression that the price was excessive? Unless the price was excessive, it would be entirely irrelevant to the story, which focuses on claims of improper conduct by funeral homes—including, as the story relates, "financial complaints" by family members who "claim they were preyed upon."

7

The defendants contend that the story never included enough details about the funeral to enable the audience to draw the conclusion that a price of $12,000 was excessive. The defendants point out that the audience never learned what kind of casket was purchased, how elaborate the service was, or what burial arrangements were made. But the defendants did not have to share these details in order to convey the message that the price charged was excessive. They achieved the same result by reporting the price, showing the invoice, and then describing House's claims about the conditions at the funeral, all in the context of a story focused on claims of improper conduct by funeral homes. Moreover, as the plaintiffs point out, Fox6's audience includes residents of the Sherman Park neighborhood in which the funeral home is located, and very few members of that neighborhood could afford to spend $12,000 on a funeral. Any viewers who were familiar with both the funeral home and the Sherman Park neighborhood would likely have concluded that the plaintiffs, in sending a bill for $12,000, were trying to take advantage of the decedent's family at a vulnerable time.

The defendants also contend that House's criticisms of the conditions of the funeral and the state of the body would be legitimate no matter what the funeral actually cost, and that therefore their reporting a false price could not have caused the plaintiffs any reputational harm not already caused by House's claims. The defendants cite a case stating that a plaintiff cannot "combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim." *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990). But in the *AIDS Counseling* case, the statements truly were immaterial, in that the statements, although false, "did not cause the story to

8

produce a different effect on the audience than would have been produced had the truth of the matter been spoken." *Id.* at 1004. In the present case, the false price was material—it caused the story to produce a different effect on the audience than it would have had either the true price been stated or the price been omitted from the story altogether. Consider how the statement would sound had it had included an accurate price:

> Paula House's 18-year-old son Claude Grimes was murdered this summer. The bill for the funeral was $1,695. But House says the funeral home was sweltering, it smelled bad, and she didn't even recognize her own son.

Reporting that the bill for the funeral was $1,695 does not have the same punch as reporting that it was "nearly $12,000," and it is hard to imagine that the defendants would have had the camera zoom in on a bill for $1,695. Of course, no matter what price was charged, House's claims were damaging to the plaintiffs' reputations. But the reputational harm was made worse by the defendants' including the false price, as it implied that in addition to House's allegations, the funeral home was overcharging its customers. At the very least, a reasonable jury could draw this conclusion, and therefore the statement is capable of a defamatory meaning.

Finally, the defendants contend that stating an incorrect price can never be defamatory because an incorrect price does not tend to expose a person to contempt, ridicule, or other types of reputational harm. I disagree. What if a news story falsely stated that a grocery store in an area recently hit by a hurricane was charging $100 for a gallon of water? The implication would be that the store was engaged in price gouging, which would obviously harm the grocery store's reputation and would be grounds for a defamation claim. *See Hull v. Town of Prattsville*, 44 N.Y.S.3d 253, 256–

9

57 (2016) (recognizing that a statement accusing someone of price gouging has defamatory meaning). Although the defendants cite a case in which a court found one specific misstatement of a price to be devoid of defamatory meaning, *Liberman v. Fieger*, 338 F.3d 1076, 1080–81 (9th Cir. 2003), the case does not support the broader proposition that reporting a false price can *never* be defamatory.

**B.** **"Working on Getting Everyone in Our Story Their Money Back"**

The plaintiffs next contend that Dwyer's statement that Davis told her that he was "working on getting everyone in our story their money back" was defamatory. The defendants contend that this statement was not false, and that even if it was, it was not capable of a defamatory meaning.

The plaintiffs contend that the statement was false because Davis never told Dwyer that he was working on getting everyone in the story their money back. Instead, he alleges that he told Dwyer two things. First, he told Dwyer that because he did not wish to cause the family of Mr. Grimes "any additional distress over finances," he "refunded a significant portion of the funeral costs to [the family] without request." Am. Compl. Ex. C at 2. Second, he told Dwyer that two families had mistakenly made overpayments to the funeral home and that he returned those overpayments to the families as of October 17, 2016. Am. Compl. ¶¶ 42 & 45. The plaintiffs contend that these statements provide inadequate support for Dwyer's report.[4]

---

[4] The defendants contend that Dwyer had a phone conversation with Davis in which Davis explicitly stated that he was working on getting everyone their money back. Br. in Supp. at 16 n.4, ECF No. 16. However, as the defendants concede, evidence of that conversation does not appear in the complaint and therefore cannot be considered in connection with the motion for judgment on the pleadings.

The defendants contend that the difference between what Dwyer stated and what Davis alleges that he told her are too insignificant to render Dwyer's statement false. The defendants point out that the common law of libel "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991). They argue that the only difference between what Davis said and what Dwyer reported is in the verb tense—although Davis had said that he already returned the families' money, Dwyer reported that he was "working on" returning the money, which implied that as of the story's airing he had not yet returned the money.

But verb tense is not the only difference between what Davis said and what Dwyer reported, especially when Dwyer's statement is considered in its full context. Dwyer made the statement about Davis's working on getting everyone their money back immediately after she reported that the plaintiffs claimed to "treat[] all clients with skill, respect, and dignity":

JD Davis Funeral Home says it treats all clients with skill, respect and dignity. Mr. Davis told me, though, he is working on getting everyone in our story their money back. The use of "though" in this statement could be understood as questioning Davis's claim to treat all clients with skill, respect, and dignity, given that he felt the need to return "everyone's" money. In other words, the statement could be understood as implying that Davis admitted to owing everyone their money back because the services he rendered were extremely deficient. Had Davis actually admitted that he was working on returning everyone's money, this implication would be justified. But what Davis actually said was more benign. With respect to two families, Davis merely stated that, due to mistakes, the families had paid more than he charged them, and for that reason he

11

returned the overpayments. With respect to the Grimes family, Davis stated that he refunded a portion of the funeral charge in order to prevent "additional distress over finances." Dwyer's reporting these facts would have resulted in the statement's having less of a "sting" than what Dwyer actually reported. *See Masson*, 501 U.S. at 517 ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"). Therefore, a jury could reasonably find that the differences between what Davis said and what Dwyer reported are more than minor inaccuracies.

For similar reasons, a jury could also reasonably find that the statement was defamatory. By stating that Davis was working on getting everyone their money back, Dwyer implied that Davis admitted to providing poor services, contrary to his claim to treat all clients with skill, respect, and dignity. The defendants contend that Dwyer's statement about returning everyone's money actually depicted Davis in a positive light, because it suggested that he was a responsive business owner who offered refunds to dissatisfied customers. Perhaps a jury will agree with the defendants on this point. But the jury could also reasonably consider the statement defamatory because it implied that Davis admitted to providing poor service to everyone involved in the story. Accordingly, the claim based on this statement will not be dismissed.

**C.     Davis "Blamed the Family" and Said "There Was Little He Could Do"**

The remaining statement at issue appeared only in the written article posted on the defendants' website and Facebook page. It reads:

> Anne Plichta, a lawyer representing Davis, sent Fox6 News [a letter] after we asked her about his criminal record and the most recent complaints against his funeral home. Davis blames one of the families for not

12

> contacting the funeral home sooner after death, saying the decomposition process had already begun by the time the body was received and there was little he could do.

Answer Ex. E at 9. The plaintiffs allege that the second quoted sentence is false in two respects: (1) Davis did not blame one of the families, and (2) he did not state that there was little he could do. The plaintiffs also allege that this sentence implies that Davis personally prepared a body for viewing, which would have been unlawful because he is not a licensed funeral director and therefore is prohibited from personally handling a corpse. The defendants contend that the statement was not false in any respect and that, even if it was, it is not capable of a defamatory meaning.

    I agree that the statement is not false. The statement paraphrased this part of the letter from Davis's lawyer:

> Mr. [redacted] died in the early morning hours of Monday, August 22, 2016 of multiple gunshot wounds to his arm, chest and back. Mr. [redacted]'s family contacted JD Davis Funeral Home on Thursday, August 25, 2016, and the Home picked up his body for funeral preparation on the morning of Friday, August 26, 2016. Due to the major trauma to Mr. [redacted]'s body and the extended time between his death and the family contacting the Home, the decomposition process had already begun by the time JD Davis Funeral Home received his body. Once this process has begun, a funeral director has limited ability to restore a body to a presentable state.

Answer Ex. C at 1–2. It is accurate to characterize the above passage as "blaming" the family for not contacting the funeral home sooner—the passage states that the family's waiting until several days after death to contact the funeral home allowed the decomposition process to begin, which in turn limited the funeral home's ability to restore the body to a presentable state. Similarly, the article's statement that "there was little [Davis] could do" is an accurate paraphrase of his lawyer's statement that, because of the body's decomposition, the funeral home had "limited ability to restore [the] body

13

to a presentable state."  There is no difference in meaning between "there was little he could do" and "limited ability" that would cause the former to harm the plaintiffs' reputations more than the latter.

I also agree with the defendants that a jury could not reasonably construe the statement to imply that Davis, who is not a licensed funeral director, personally prepared the body for viewing, in violation of state law.  First, the article does not state that Davis is not a licensed funeral director or that it is unlawful for a person who is not a licensed funeral director to handle a corpse.  Davis contends that the article did not have to state these additional facts, because those that know him and the funeral-home industry would know that he is unlicensed and that it would have been unlawful for him to handle a corpse.  Even so, the statement is still not false because the statement does not imply that Davis *personally* prepared the body for viewing.  When the article introduces Davis, it describes him as the owner of the funeral home bearing his name.  Reasonable people know that most businesses have employees, and that the business's owner does not personally carry out every act in furtherance of the business.  Yet, it is common to refer to a business by the name of its owner and to attribute acts of the business to the owner, especially when it is a small business and the owner's name is also the name of the business, as it is with the JD Davis Funeral Home.  Thus, no reasonable reader of the article could think that the article, in stating that there was little Davis could do to restore the already decomposing body, was implying that Davis personally prepared the body for viewing.  The article was simply using Davis's name to refer to the funeral home itself, and it did not specify who at the funeral home actually prepared the body.  Any reader who knew enough about Davis and the funeral-home

14

industry to know that he was unlicensed and that it was unlawful for him to personally prepare the body would also know that if Davis said that "there was little he could do," he was referring to himself as the owner of the business, not as the person who prepares the bodies. Thus, the statement's references to "Davis" and "he" are not false or defamatory.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for judgment on the pleadings (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the plaintiffs' claim regarding the statement that Davis blamed one of the families and said that there was little he could do. In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that the defendants' motion to stay discovery pending resolution of their motion for judgment on the pleadings (ECF No. 19) is **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin, this 17th day of October, 2017.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge